UNITED STATES of America,

v.

Ryan CAMBRELEN, Joel Vasquez, Jose Rivera, Eddie Brown, Jesus Manuel Romero Colon, Ottoniel Cambrelen, Defendants.

No. CR 96–1044(S–2).

United States District Court,
E.D. New York.

Dec. 1, 1998.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, New York, (Timothy Macht and John Caruso, Assistant United States Attorneys, of counsel), for U.S.

Philip Katowitz, New York City, for defendant Ryan Cambrelen.

Albert J. Brackley, Brooklyn, New York, for defendant Joel Vasquez.

Scott Yale Auster, Carmel, New York, for defendant Jose Rivera.

Neil Checkman, New York City, for defendant Eddie Brown.

Kevin J. Keating, Garden City, New York, for defendant Jesus Colon.

David G. Secular, New York City, for defendant Ottoniel Cambrelen.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

By memorandum and order dated August 27, 1998, familiarity with which is assumed, the court denied the motions of the six defendants to set aside guilty verdicts. The court now writes to set forth its findings and conclusions as to the sentences.

### I

Five counts of the superseding indictment were before the jury. Four of the defendants, Ryan Cambrelen ("Ryan"), Joel Vasquez, Jose Rivera, and Eddie Brown (together "the four main defendants") were charged in and found guilty on all five counts, (1) conspiring to possess with intent to distribute cocaine for over two and a half years from January 1994 to November 9, 1996 (denominated Count One in the superseding indictment), (2) conspiring during the same period to obstruct interstate commerce by robbing several residential apartments in the Bronx, New York, and a warehouse in Queens, New York (denominated Count Two), (3) attempting on November 9, 1996, to possess with intent to distribute cocaine (denominated Count Three), (4) using and carrying a firearm in each of the two conspiracies charged in Counts One and Two (denominated Count Seven), and (5) using and carrying a firearm in the November 9, 1996 attempt count charged in Count Three (denominated Count Eight). There was ample evidence to prove all the elements of these five crimes.

The two other defendants, Jesus Colon and Ottoniel Cambrelen ("Ottoniel"), were charged in all five counts, but were found not guilty by the jury of the conspiracy counts. They were found guilty of the November 9, 1996 attempt count (Count Three) and of using and carrying a firearm during that attempt (Count Eight).

### II

The evidence showed that the four main defendants were engaged from January 1994 until July 1996 in robbing various dwellings in New York City, chiefly apartments where they expected to find drugs. While the four were assiduous, they were not notably successful in their endeavors, managing to obtain over a period of two and a half years some two kilos of cocaine.

By the fall of 1996 the New York Drug Enforcement Task Force (the "Task Force") had taken an interest in the activities of the four. On July 30, 1996 one Luis Castellano had been arrested by New York City detec-

tives for his participation in an April 1996 robbery in the Bronx in which defendants Ryan, Vasquez, and Brown had taken part. Castellano admitted to involvement in other robberies with the group and eventually pleaded guilty pursuant to a cooperation agreement and testified for the government at trial.

In October 1996 the Task Force arranged for two confidential informants to meet with Ryan and Rivera. The meeting took place on October 29, 1996 and was captured on videotape. One of the informants, a Puerto Rican, was acquainted with Ryan and introduced the other informant (hereafter "the informant"), who posed as a Colombian drug dealer.

The informant told Ryan and Rivera that he was responsible for organizing the distribution of some 70 to 80 kilos of cocaine arriving in New York from Columbia in about a week; that he had been cheated in the past by those sending the cocaine and wished to have it stolen from the stash location and sold; that he wanted Ryan and his group for the job; and that he would furnish Ryan with the address of the location and a key to it to facilitate the robbery. Ryan said that there would be six persons to carry out the robbery. He agreed with the informant that the six would receive six eighths of the proceeds of the robbery and the two informants two eighths.

On November 8, 1996 the informant had another videotaped meeting with Ryan and Rivera, and told them that a truck would arrive at the location the next morning, November 9, 1990, that "eighty kilos are coming," and that he would have the key to the location. The informant cast doubt on whether the "boss" sending the cocaine had given him a true description of what would be found at the stash location by saying the boss was "very distrustful." He "sometimes" told the informant that there would be only one person inside the location but, as the informant put it, "I go there, and it turns out there are four guys there." The informant summed up the circumstances into which defendants would be entering by saying, "you know Colombians are not easy."

The informant asked Ryan how much he would be paid for his "stuff" and whether "you guys will sell it for me." Ryan responded that they would sell it "for 16," meaning sixteen thousand dollars per kilo, but that "it takes time to sell it." To the informant's query "you'll sell five and call me," Ryan replied "right." The informant then said "call me and give me money and then you call me again." Again Ryan responded "right."

On the next morning, November 9, 1996, the confidential informant met with Ryan and gave him the key to the stash location, an undercover warehouse. In the meantime the Task Force had placed there 5 kilos of real cocaine and about 50 kilos of fake cocaine and had installed video cameras inside and outside the warehouse.

Later in the morning the six defendants (Colon and Ottoniel had come from Puerto Rico the previous day) went to the warehouse, three in a van and three in a car. Ryan and Brown went inside. The other four waited outside, Vasquez and Ottoniel in the van and Rivera and Colon in the car. Ryan and Brown were then arrested inside the warehouse and Rivera and Colon outside. Vasquez drove the van away at high speed, followed by police cars. When Vasquez tried to make a U-turn the van's tires blew out and the police arrested Vasquez and Ottoniel.

### III

As this court stated in its memorandum and order dated August 27, 1998, the evidence before the jury was sufficient to sustain the verdict finding Ryan, Vasquez, Rivera, and Brown guilty of conspiring to possess and attempting to possess the cocaine in the warehouse with intent to distribute it. The jury found Colon and Ottoniel guilty of the warehouse attempt charge but not the conspiracy charge.

The terms of imprisonment imposed by the court on the six defendants and those urged by the government and recommended in the presentence report were as shown below:

| Defendant | Sentence Imposed By The Court | Government's Position & PSR Recommendation |
|---|---|---|
| Ryan Cambrelen | 535 months | 660 months |
| Joel Vasquez | 660 months | Life |
| Jose Rivera | Life | Life |
| Eddie Brown | 510 months | Life |
| Jesus Colon | 180 months | 215 months |
| Ottoniel Cambrelen | 180 months | 215 months |

The details of the court's computation of the sentences is given in an appendix to this memorandum and order. For Rivera the life sentence was mandatory under 21 U.S.C. §§ 841(b)(1)(A) and 851(a)(1), because the government filed a prior felony information asserting that Rivera had been convicted in New York State court on July 7, 1995 of two offenses, attempted criminal sale of a controlled substance and attempted criminal possession of a controlled substance with intent to sell, and received a sentence of one year on each offense.

The terms of imprisonment for the three other main defendants were determined by the court under the Guidelines for Count One, charging the conspiracy between January 1994 and November 9, 1996 to possess with intent to distribute cocaine. The sentences on all other counts except the firearm counts run concurrently to that imposed on Count One.

The base-level urged by the government and applied by the presentence report was a level 36, based on at least 50 kilograms and less than 150 kilograms of cocaine. The government and the defendants disagreed as to the amount of kilograms "involved" in the crime. The court found that the amount of cocaine attributable to defendants was at least 5 kilograms but less than 15 kilograms and thus determined the base offense-level to be a level 32 under section 2D1.1 of the Sentencing Guidelines.

As the Guideline commentary notes, "[t]he principles and limits of sentencing accountability ... are not always the same as the principles and limits of criminal liability." U.S.S.G. § 1B1.3, Application Note 1. In the case of narcotics crimes, the Guidelines tie punishment to the quantity of drugs "involved." See U.S.S.G. § 2 Part D, entitled "Offenses Involving Drugs." The jury did not deliberate on the issue of quantity. That is not an element of the offenses.

Guideline section 2D1.1(a)(3), in pertinent part, instructs a sentencing court to assign to the crime the base offense-level specified in the Drug Quantity Table in subsection (c). ·But nothing in the applicable subsections of section 2D1.1, or in any of the corresponding application notes, provides a formula for determining the base-level in a conspiracy or attempt case such as the present.

When the amount of drugs "involved" is contested, the government has the burden to establish by a preponderance of the evidence the quantity attributable to the defendants. See United States v. Colon, 961 F.2d 41, 43 (2d Cir.1992); United States v. Hendrickson, 26 F.3d 321, 332 (2d Cir.1994).

Two general principles guide the court. The first is the language of 21 U.S.C. § 846 stating that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." The second is the fact that the words "attempt or conspiracy" appear in the heading of section 2D1.1. See Amendment 447 to the United States Sentencing Commission Guidelines Manual, Appendix C, 254–55 (1997) (effective as of November 1, 1992). Amendment 447's consolidation of attempt and conspiracy with the completed offenses is consistent with former section 2D1.4, which set the base-level for a conspiracy or attempt as if the "object" of the conspiracy or attempt had been completed. See Hendrickson, 26 F.3d at 330 & n. 6.

The focus of the sentencing court in drug conspiracy cases is thus on the "object" of the conspiracy. Since the crime of conspiracy is by definition incipient, its object can be inferred only from the terms of the unlawful agreement as informed by the surrounding circumstances. See United States v. Tejada, 956 F.2d 1256, 1264 (2d Cir.1992) ("agreement defines the conspiracy"); United States v. Rubin, 844 F.2d 979, 983 (2d Cir.1988) ("The fundamental element of a conspiracy is the unlawful agreement.").

Generally in narcotics crimes the object of the conspiracy is to sell or possess and distribute drugs. Every drug conspiracy has an unlawful objective, and almost all will have

an agreement as to a specified quantity of drugs involved. A drug conspiracy also typically involves some form of a transaction, either an actual one or a sting operation, with defendants acting as buyers or suppliers. Where there is such a transaction the court can generally infer the quantity term by examining the agreement itself. The parties in the course of their dealings will presumably work out the details and reach an agreement on key terms such as the type of drugs, price, financing, time and mode of delivery, and, of course, the quantity.

But even in cases involving drug transactions, the Second Circuit has cautioned against the hasty application of figures thrown out during negotiations to determine the amount of drugs attributable to the conspiracy. In *Hendrickson*, the court stated that the term "negotiated amount" must be that which can reasonably be construed as an "agreed amount," before it can be used to set the base-level. 26 F.3d at 334.

## IV

■ This case involves a conspiracy to rob a warehouse. The government claims that defendants should be held accountable for conspiring to steal 80 kilograms of cocaine because they were told by the undercover informant on the day before the robbery that "eighty kilos are coming." The government says other evidence supports this claim, namely, that Ryan expressed interest in a job involving large quantities of narcotics, that he claimed his group was made up of "professionals prepared for all kinds of jobs," and that on the day of the crime he brought along five others.

But these statements and acts do not support a finding that the defendants made an agreement to rob a specified quantity of eighty kilos of cocaine. At most the facts support a finding that defendants formed a conspiracy to rob a warehouse that they believed to contain a substantial amount of drugs.

Ryan never reached an accord as to quantity with the confidential informant. Robbery is risky business. From the perspective of the defendants, they were helping a Colombian drug dealer commit theft. They were attempting to take the property of another, against the victim's will, by means of actual or threatened force. Unlike a drug transaction, defendants certainly had no "deal" with any party claiming control or possession over the drugs or their delivery to the warehouse. Defendants were dealing with a government agent thought by them to be a party to the robbery.

In the second videotaped meeting the informant's description of his "boss" hardly encouraged confidence in his statements as to what would be found in the warehouse. The "boss" was described as "very distrustful," a person who gave out grossly inaccurate information from time to time. He would "sometimes" tell the informant there would be only one person at a stash location, yet when the informant goes there, "it turns out there are four guys there." In fact, in the final meeting with Ryan, the informant cast doubt on the likelihood of there being as many as eighty kilos in the warehouse by saying that there would be only one, unarmed person inside the warehouse guarding the cocaine.

Ryan's statements on the videotapes evidenced his suspicion that those suggesting lucrative opportunities to commit crimes are, to say the least, puffing. In his initial meeting on October 29, 1996 with the informant, Ryan says that recently "tipsters" who told his group about good drug stash locations had "bullshit" them and described "high" amounts of drugs and money to be had but that when the group arrived, "there's less and we're so many." Indeed, he describes a job "for over a million" that had gone awry. After all, the four main defendants were only able to obtain about 2 kilos of cocaine in all of their prior efforts combined.

But more importantly there is specific evidence in the record showing that Ryan and the other defendants did not expect that the quantity of cocaine in the warehouse would be anywhere near 80 kilos.

After Vasquez was arrested he waived his *Miranda* rights and gave a written statement to the agents. He admitted the substance of the charges in Count One of the superseding indictment. He described how

he was called by Ryan and asked if he wanted to work "cause a man had a job to steal a quantity of cocaine from him." He said Ryan told him "to hurry because he had been given the key to the place already and there were at least 20 kees," meaning twenty kilos.

It is not unfair to conclude that Ryan exaggerated in speaking to Vasquez in order to get him to "hurry." Ryan deemed it critical that Vasquez be there and had a motive not to minimize but to overstate the amount of cocaine he thought would be found. There is no other evidence in the record revealing what amount of cocaine any of the other four defendants were told or thought was there for the stealing.

The same base offense-level is applicable to the range between 5 kilos and 15 kilos less one gram. The government has the burden of proving that the defendants believed that more than 15 kilos less once gram would be in the warehouse. The government has not met that burden.

## V

■ But even if the government had met the burden of proving a figure of 15 or more kilos, a downward departure is warranted according to Application Note 15 of section 2D1.1.

The court considers the transaction in which the informant and Ryan were engaged to be analogous to what the Guidelines call a "reverse sting," where a government agent negotiates to sell drugs to a defendant. Application Note 15, adopted by Amendment 486 on November 1, 1993, reads as follows:

> If in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

In this case the informant was in effect selling cocaine on consignment to Ryan and his cohorts. The "price" to be paid to the informants was not a fixed amount. It was two-eighths of the amount realized on the sale of whatever cocaine was obtained from the warehouse. The defendants would keep six-eighths of the proceeds of the sale and would pay to the informants only two-eighths.

In the usual reverse sting case, an informant "artificially" enhances the number of kilos in the transaction by setting a price substantially below market price to induce the defendants to buy more kilos than his available resources would have allowed him. That is exactly comparable to what the informant did here. His proposal was in effect to furnish to defendants on consignment whatever cocaine was in the warehouse—he claimed 80 kilos—in exchange for payment of one-quarter of the amount thereafter obtained on the sale of the cocaine. The "price" to the defendants for their share was low indeed, far below the market rate. The informant thus tried to ratchet up the number of years of incarceration the defendants would face.

Since the shift to a sentencing scheme that strictly ties sentencing to the quantities of drugs involved, many courts and commentators have expressed concern over the large discretion that law enforcement officials have in setting the amount of those quantities "involved" in a case. *See, e.g., United States v. Lacey,* 86 F.3d 956, 966 (10th Cir.1996) (the "sentencing guidelines present opportunities for ... ratcheting up the punishment"); *United States v. Staufer,* 38 F.3d 1103, 1107 (9th Cir.1994) (an agent can "negotiate with somebody for an ounce, a pound, a kilo, 100 kilos, a million kilos of a substance and, of course, if the defendant bites at the bait, then that amount chosen by the drug agent will determine his drug sentence.") (quoting district court); *see also United States v. Calva,* 979 F.2d 119, 123 (8th Cir. 1992); *Conference on the Federal Sentencing Guidelines: Summary of Proceedings,* 101 Yale L.J.2053 (1992).

The influence that confidential informants have in setting the drug quantity is especially

troubling since those people are often in the process of negotiating down their own drug sentences or charges with prosecutors, and have enormous incentive to inflate the drug quantities involved in the cases they help prosecute. *See United States v. Stavig,* 80 F.3d 1241, 1247 (8th Cir.1996). Unfortunately the government must often rely on informants to notify them of the amount that defendants are likely to accept. Reverse sting cases thus require "the most careful scrutiny and a probing examination by the district court." *Id.* at 1247.

An analogy to Application Note 15, a modest attempt to deal with an acute problem, does not require this court to set the base-level calculated solely on the amount of drugs actually in the warehouse or believed by defendants to be there, but allows a downward departure in an appropriate case. While the Note addresses a reverse sting situation, there is no good reason why the court should not regard the Note as authorizing by analogy the power to depart where the government agent has led the defendant to steal drugs rather than to buy drugs.

Even if the defendants believed they would be able to obtain more than 15 kilos, indeed as many as 40 kilos (twice the amount Ryan told Vasquez), an appropriate downward departure would be to a base-level of 32, applicable to offenses involving cocaine in the amount between 5 and 15 kilos less a gram. The sentences imposed at that level are more than sufficient to act as a general and specific deterrent and to vindicate the needs of the law.

The court departs downward to a level 32.

## VI

Ottoniel and Colon say that a four-level adjustment to the base-level is warranted on account of their "minimal" role in the attempt. The government and probation department have recommended only a two-level departure for a "minor" role.

■ The defendant has the burden to establish by a preponderance of the evidence that his level of culpability entitles him to a reduction. *See United States v. Garcia,* 920 F.2d 153, 156 (2d Cir.1990).

Application Note 1 of U.S.S.G. § 3B1.2 says that a minimal role reduction is justified for "defendants who are plainly among the least culpable of those involved in the conduct of a group." A defendant's "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." *Id.* The Guidelines define a "minor participant" as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, Application Note 3.

■ Ottoniel and Colon were plainly "the least culpable" members of the enterprise. Their addition at the last minute and their acquittal on the conspiracy counts show that they lacked knowledge of the details and scope of the group's criminal enterprise, which spanned over two years and at least eight robberies. They were not a part of any of the group's previous criminal activities. Even with respect to the warehouse robbery, they were not part of any of the negotiations or planning. During the attempted robbery, Colon sat and waited in the rear seat of the car, and Ottoniel in the van. Neither defendant was given the role of driver. Although weapons were found inside the vehicles, the government does not suggest they supplied those weapons or undertook to hide them. They did not supply or own the vehicles.

The government argues that they are not entitled to a minimal role adjustment because they traveled from Puerto Rico to participate in the warehouse robbery, were with the other defendants before that attempt, were found in vehicles containing guns, and arguably were promised an equal share of the proceeds of the robbery.

But the fact that they flew in and were present at the warehouse constitutes no more than the bare minimum of acts without which they could not have participated in the crime at all. They resided in Puerto Rico. They had to get to the site of the robbery. Moreover, the fact they were with the other defendants for a short time before the robbery supports, rather than undermines, their position that they were mere extra hands on the

day of the crime. Had they taken a more active role in the planning, they would have had the opportunity to participate in some other capacity.

Finally, Ryan's statement that every participant to the robbery would be given an "equal share" of the proceeds, was not made in the presence of Colon or Ottoniel, and under the circumstances of this case, is not persuasive as to their knowledge or understanding of the scope and structure of the criminal enterprise or the activities of the others.

■ In reaching the conclusion that Colon and Ottoniel were minimal participants, the court is mindful of cases in this circuit explaining that a defendant should not be given a minor or minimal role reduction based solely upon a relative determination of his culpability compared to that of his co-conspirators. A reduction is appropriate only where defendant is substantially less culpable than "the average participant in such a drug crime." *United States v. Ajmal,* 67 F.3d 12, 18 (1995); *see also* U.S.S.G. § 3B1.2, Background Commentary (defendant's role must be "substantially less culpable than the average participant.").

In comparing defendant's role to the average participant's role "in such a drug crime," the court must determine how broadly or narrowly to construe the term "such a drug crime." There is little guidance in the caselaw. But the language and structure of the Sentencing Guidelines suggest that the categorization should be relatively narrow.

A determination that a defendant should or should not get a reduction because of his role in the offense must, of course, be made "in the context of the facts of the case." *United States v. Lopez,* 937 F.2d 716, 728 (2d Cir. 1991). But the scale of the criminal enterprise, as reflected by the quantity of drugs involved, the complexity of the operation, and the potential harm to society, is taken into account by the setting of the base-level. The base-level is the primary tool for distinguishing between less and more offensive crimes. Colon and Ottoniel are being punished severely for mere participation in the crime, and they are being punished severely for being present in vehicles with guns.

It is true Colon and Ottoniel participated in a very serious crime. It involved at least 5 kilos of cocaine, requiring a mandatory ten-year sentence. The provisions for mitigating or aggravating roles do not address the enormity of the crime. Chapter Three is called "Adjustments;" and Part B specifically provides for adjusting the sentence-level based on each defendant's "role in the offense." Commentary to subsection one for Aggravating Role, a parallel section to subsection two discussing mitigating roles, states that the "adjustment is included primarily because of concerns about relative responsibility."

The seriousness of the crime cannot in fairness be taken into account in characterizing the part Colon and Ottoniel played in it. It is hard to conceive how much less they would have had to have done to qualify for a minimal role adjustment. To interpret the term "such a drug crime" referred to in *Ajmal* to be inapplicable to a person who has committed a serious crime would be to disregard the purpose of section 3B1.2 of the Guidelines.

Analyzing the two defendants' roles relative to Ryan, Vasquez, Rivera, and Brown, and to a hypothetical average participant in a drug crime of comparable scale, the court finds that defendants Colon and Ottoniel played minimal roles in the warehouse robbery.

### VII

Based on the facts stated in the presentence report, the court departed downward two levels in the sentence of Colon for extraordinary family circumstances, in particular the physical condition of his son Candy, age five.

■ Pursuant to U.S.S.G. § 3B1.4 the probation department added two levels to the computation of the sentence-level of Vasquez and Brown for the "use" of a minor, Castellano, to commit some of the robberies of drugs. The court does not find those additions justified. Castellano was a minor (although in the court's eyes he did not look it). But he was a full-fledged member of the group who on his own initiative brought a potential rob-

bery opportunity to the other members of the group. He shared equally in the proceeds of the thefts. He was a partner with the others. He was no mere employee, and in no realistic sense can it be. said he was "used" by the others. Moreover, nothing in the record suggests that his status as a minor facilitated the commission of the crimes.

For Brown, the probation department recommended a three level adjustment under U.S.S.G. § 3B1.1(b) for his managerial role in a criminal activity involving more than five participants. The court finds such an adjustment not warranted by the evidence. Brown was an active member, but not a leader or a manager.

Except as noted above in this memorandum and order the court adopted the probation department's findings as set forth in the presentence report.

So ordered.

## APPENDIX

1) Ryan Cambrelen

Imprisonment

Count 1    235 months
Count 2    210 months, concurrent with Counts 1 & 3
Count 3    235 months, concurrent with Count 1
Count 7    60 months, consecutive to all other counts
Count 8    240 months, consecutive to all other counts

5 years supervised release on all counts, to run concurrently.

$500 in Special Assessments.

Restitution of $67,580 to be paid at rate of $15 per month.

| | |
|---|---|
| Base Level | 32 |
| Criminal History Category . . . . . I | |
| Adjustment for Role in the Offense | +4 |
| Victim Related Adjustment | +2 |
| **Total Offense Level** | **38** |

| | |
|---|---|
| Drug and Robbery Counts | 235 months |
| Firearms Counts | 300 months |
| **Total** | **535 months** |

2) Joel Vasquez

Imprisonment

Count 1    360 months
Count 2    210 months, concurrent with Counts 1 & 3
Count 3    360 months, concurrent with Count 1
Count 7    60 months, consecutive to all other counts
Count 8    240 months, consecutive to all other counts

5 years supervised release on all counts, to run concurrently.

$500 in Special Assessments.

Restitution of $215,580 to be paid at rate of $15 per month.

| | |
|---|---|
| Base Level | 32 |
| Criminal History Category . . . . . III | |
| Adjustment for Role in the Offense | +4 |
| Victim Related Adjustment | +2 |
| Adjustment for Obstruction of Justice (Reckless flight from law enforcement officials) | +2 |
| **Total Offense Level** | **40** |

| | |
|---|---|
| Drug and Robbery Counts | 360 months |
| Firearm Counts | 300 months |
| **Total** | **660 months** |

3) Jose Rivera

Imprisonment

Count 1    life (mandatory pursuant to 21 U.S.C. §§ 841(b)(1)(A) & 851(a)(1))
Count 2    210 months, concurrent with Counts 1 & 3
Count 3    life, concurrent with Count 1
Count 7    60 months, consecutive to all other counts
Count 8    240 months, consecutive to all other counts

5 years supervised release on all counts, to run concurrently.

$500 in Special Assessments.

Restitution of $220,580 to be paid at rate of $15 per month.

| | |
|---|---|
| Base Level | 32 |
| Criminal History Category . . . . . VI | |
| Victim Related Adjustment | +2 |
| **Total Offense Level** | **34** |

| | |
|---|---|
| Drug and Robbery Counts | life |
| Firearms Counts | 300 months |
| **Total** | **life** |

4) Eddie Brown

Imprisonment

Count 1    210 months
Count 2    210 months, concurrent with Counts 1 & 3
Count 3    210 months, concurrent with Count 1
Count 7    60 months, consecutive to all other counts
Count 8    240 months, consecutive to all other counts

5 years supervised release on all counts, to run concurrently.

$500 in Special Assessments.

Restitution of $220,580 to be paid at rate of $15 per month.

| | |
|---|---|
| Base Level | 32 |
| Criminal History Category . . . . . IV | |
| Victim Related Adjustment | +2 |
| **Total Offense Level** | **34** |
| Drug and Robbery Counts | 210 months |
| Firearm Counts | 300 months |
| **Total** | **510 months** |

5) Jesus Colon

Imprisonment

Count 3    120 months (mandatory minimum pursuant to 21 U.S.C. § 841(b)(1)(A))
Count 8    60 months, consecutive to Count 3

5 years supervised release on Count 3.

2 years supervised release on Count 8, to run concurrently to Count 3.

$200 in Special Assessments.

| | |
|---|---|
| Base Level | 32 |
| Criminal History Category ..... I | |
| Adjustment for Role in the Offense | −4 |
| Adjustment for Extraordinary Family Circumstances | −2 |
| **Total Offense Level** | **26** |

| | |
|---|---|
| Drug Count | 120 months |
| Firearms Counts | 60 months |
| **Total** | **180 months** |

6) Ottoniel Cambrelen

Imprisonment

Count 3   120 months (mandatory minimum pursuant to 21 U.S.C. § 841(b)(1)(A))

Count 8   60 months, consecutive to Count 3

5 years supervised release on Count 3.

2 years supervised release on Count 8, to run concurrently to Count 3.

$200 in Special Assessments.

| | |
|---|---|
| Base Level | 32 |
| Criminal History Category ..... I | |
| Adjustment for Role in the Offense | −4 |
| **Total Offense Level** | **28** |

| | |
|---|---|
| *Drug Count* | *120 months* |
| *Firearms Counts* | *60 months* |
| **Total** | **180 months** |