**UNITED STATES of America,**

v.

**Mario PANDURO, Defendant.**

**No. 00 CR 107(SAS).**

United States District Court,
S.D. New York.

May 31, 2001.

**400**

Jonathan Marks, New York City, for Defendant.

Dani James, Assistant United States Attorney, New York City, for the Government.

## OPINION

SCHEINDLIN, District Judge.

Defendant Mario Panduro has moved for downward departures based on extraordinary family circumstances and Application Note 15 to United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1. In addition, Panduro has argued for a minor role adjustment pursuant to U.S.S.G. § 3B1.2(b). Lastly, Panduro has objected to the Government's determination of drug quantity. Because there were disputed issues of fact, a *Fatico* hearing was held where tape recordings of a number of conversations between Panduro and others were received in evidence. Both parties submitted post-hearing memoranda. I have also reviewed the presentence report ("PSR").

Based on this record, I conclude that the base offense level is 34 because defendant's co-conspirators only agreed to buy 35 kilograms of cocaine, rather than the 70 kilograms suggested in the PSR and urged by the Government. Furthermore, defendant is entitled to a three-level downward departure based on Application Note 15 and the overly generous credit terms extended by the law enforcement officials involved in this reverse sting operation. Finally, defendant is not entitled to a minor role adjustment or a downward departure based on extraordinary family circumstances. These issues will be discussed in turn.

## I. BACKGROUND

### A. The Transaction

Defendant was arrested as a result of a reverse sting operation, *see infra* Part II.A, organized by Special Agent Rhett

Fonseca ("Agent Fonseca"). It all started when Panduro called a long-time friend, Carlos Martinez, in Peru. *See* Transcript of *Fatico* Hearing, April 12, 2001 ("4/12/01 Tr.") at 9 (Testimony of Mario Panduro). During this conversation, Carlos Martinez mentioned a person called Junior who was looking for someone in the United States to buy drugs. *See id.* at 10. Even though Panduro disclaimed knowing anyone who could help Junior, he received a phone call from Junior in mid-December of 1999. *See id.* at 11. Junior informed Panduro that he had 70 kilograms of cocaine in Miami and that he was looking for a buyer. *See id.* at 12. Desperate for money, Panduro got in touch with co-defendant Alberto Bare, a bar room acquaintance. *See id.* at 12–13. Bare expressed interest in the deal and mentioned another potential purchaser, Ezequiel Inoa. Meanwhile, Junior introduced Panduro to someone named Lorenzo who told Panduro that the drugs had been moved to Seattle, Washington. *See id.* at 17–18. At this point, Agent Fonseca entered the scene posing as "Carlos," the person purportedly in possession of the drugs. *See id.* at 18.

On January 5, 2000, Carlos had a telephone conversation with Panduro. *See id.* During this conversation, Carlos and Panduro discussed price and quantity. *See* Defendant's Exhibit A, Jan. 5, 2000 Tab ("1/5/00 Tr.") at 3–4. When Carlos asked "how much quantity are you looking for?," Panduro replied "I'd say 40 exactly. And we can even buy the 60 from you, brother." *Id.* at 3. Carlos then informed Panduro that the price for 40 kilograms was different than the price for 70 kilograms.[1] *See id.* Carlos proposed a price of $16,000 per kilogram which Panduro accepted.

*See id.* at 6. Toward the end of the conversation, Carlos asked Panduro whether they were talking about 70 kilograms to which Panduro responded "Well, alright, so . . . I'm gonna call. Let me call you back. Okay?" *Id.* at 8.

On January 11, 2000, Panduro and Ezequiel Inoa flew to Seattle to discuss the details of the proposed transaction with Carlos. *See* 4/6/01 Tr. at 20. At that meeting, Panduro and Inoa expressed their interest in purchasing 70 kilograms. For example, during the early part of the meeting, Carlos asked, "We're talking about 16,000 . . . per kilo. Yes. If you buy 70 kilos," to which Panduro responded, "For 70, exactly." Defendant's Exhibit A, January 11, 2000 Tab ("1/11/00 Tr.") at 22. Later on, Carlos asked, "So then you guys want the 70 for sure?" *Id.* at 29. Panduro responded "The whole thing." *Id.* Panduro and Carlos calculated the total purchase price to be $1,120,000, half of which the agent proposed be paid on delivery while the other half would be paid at an unspecified later time. *See id.* at 30. Panduro and Inoa wanted the entire purchase to be on credit, but when Carlos would not agree they returned to New York. In this regard, Panduro offered the following credible testimony: "We didn't agree to anything because we wanted to get credit and there was none, so we came back.". 4/12/01 Tr. at 20.

Over the next several days, Carlos had a series of telephone calls with Panduro and a person named Reynaldo, whom Panduro described as the owner of the business that he was representing. *See* 4/6/01 Tr. at 25; 4/12/01 Tr. at 23. *See also* Defendant's Exhibit A, Jan. 14, 2000 Tab

---

1. The quantity increased by 10 kilograms due to a misunderstanding on the part of Agent Fonseca. In Spanish, 60 and 70 are similarly pronounced and Agent Fonseca thought Panduro had said 70 kilograms instead of 60.

*See* Transcript of *Fatico* Hearing, April 6, 2001 ("4/6/01 Tr.") at 59 (Testimony of Agent Fonseca). This error serves to highlight the arbitrary nature of the drug quantity under discussion.

("1/14/00 Tr.") at 2. Reynaldo informed Carlos that he had $300,000 for the transaction. *See* 1/14/00 Tr. at 5. Reynaldo also suggested that Carlos send a representative to New York to pick up the money while, at the same time, he would send a representative to Seattle to pick up the cocaine. *See id.* On January 19, 2000, Carlos agreed to deliver the cocaine to New York for an additional fee. *See* Defendant's Exhibit A, Jan. 19, 2000 Tab ("1/19/00 Tr.") at 4; *see also* 4/6/01 Tr. at 26–27 (Testimony of Agent Fonseca). To provide some assurance of payment, Carlos suggested that the first transaction be limited to 35 kilograms. *See* 1/19/00 Tr. at 4. It was then agreed that Reynaldo would pay $280,000 up front for the first 35 kilograms. *See id.* at 7–8. *See also* 4/6/01 Tr. at 27–28 (Testimony of Agent Fonseca). No date was set for delivery of the remaining 35 kilograms.[2] *See* 4/6/01 Tr. at 72; *see also* 4/6/01 Tr. at 71, 72 (Agent Fonseca conceded that he did not have a firm agreement or date as to delivery of the second 35 kilograms).

Negotiations almost broke down after that as Panduro attempted to convince Carlos to do the deal without Panduro and Reynaldo flying to Seattle to serve as human collateral. *See* 4/6/01 Tr. at 29, 32 (Testimony of Agent Fonseca). In response, Carlos suggested that they do a straight cash deal for 19 kilograms. *See id.* ("let's just do 19 kilograms and we'll finish, and we won't have to do anything else"); *see also* Defendant's Exhibit A, Jan. 31, 2000 Tab ("1/31/00 Tr.") at 5. A short time later, Panduro called Carlos back and indicated that he would be traveling to Seattle the following day with Alberto Bare, whom Panduro described as an associate of Reynaldo's. *See* 4/6/01 Tr. at 30. Apparently, the parties decided to go ahead with the 35 kilogram transaction. Panduro and Bare were arrested on February 3, 2000 after an undercover agent in New York was shown the $300,000 down payment for the 35 kilograms.

## B. Panduro's Family Circumstances

Panduro has a 12 year old daughter, Talia, living in Peru who suffers from microencephalitis (a small head). *See* 4/12/01 Tr. at 4. Panduro's sister, Araly Panduro, testified that the child doesn't walk, see or speak. *See* 4/6/01 Tr. at 52. She also needs to be fed and changed. *See id.* While Panduro hasn't seen his daughter since 1995, he has spoken to her on the telephone. *See* 4/12/01 Tr. at 5–6. While Talia only babbles on the phone, she gets excited when her father calls. *See id.*

Panduro emigrated from Peru in 1995, leaving his daughter to be taken care of by his sister and parents. *See id.* at 5. While employed in the United States, Panduro sent between $250 and $300 a week to his family in Peru. *See id.* at 7. These payments helped cover Talia's monthly medical treatment and expensive medicines.

---

**2.** Also left open were the amount of the down payment for this second installment and the credit terms for the remainder of the purchase price. In fact, Panduro disputes that there was an agreement for another 35 kilograms. On direct examination, Panduro testified as follows:

 Q. To your knowledge, had Carlos and Reynaldo ever agreed to purchase anything more than 35 kilos?
 A. As far as I know, no. Seeing as there was not much money and they never got to an agreement, just the 35 kilos at the beginning.

4/12/01 Tr. at 25. On cross-examination, Panduro testified:

 Q. So even though they had talked about doing half, 35, Carlos informed you that he was sending the entire 70, isn't that right?
 A. Yes; but what was discussed was always 35. There was never discussion of doing 70.

*Id.* at 45. I credit Panduro's testimony in this regard.

*See id.* at 5. After Panduro was let go from his job in November of 1999, his family was forced to live off of their savings. *See id.* at 8. Since then, Araly has come to the United States for work, leaving Talia to be cared for by Panduro's mother and a young female assistant. *See* 4/6/01 Tr. at 53. Araly sends money to her family in Peru whenever she can. *See id.* at 54.

## II. DISCUSSION

### A. Drug Quantity

The Government contends that the record clearly establishes that Panduro and his co-conspirators agreed to purchase 70 kilograms of cocaine from Agent Fonseca and that this amount should set Panduro's base offense level. Panduro argues that the agreed-upon quantity was 35 kilograms and that the Government failed to carry its burden of establishing any amount greater than 35 kilograms.

In a reverse sting, the defendant agrees to buy a certain amount of drugs for a certain prearranged price, usually from an undercover agent or confidential informant. *See United States v. Gomez,* 103 F.3d 249, 252 n. 1 (2d Cir.1997). Because the Government unilaterally sets the quantity and price for the most part, there is a significant risk that the Government will inflate the agreed upon quantity in order to obtain harsher sentences for those arrested. *See United States v. Lora,* 129 F.Supp.2d 77, 80 (D.Mass.2001) ("In a sentencing regime that largely equates culpability with the amount of drugs attributable to the defendant, the potential for abuse by law enforcement agents is substantial."). *See also United States v. Cambrelen,* 29 F.Supp.2d 120, 125 (E.D.N.Y. 1998) ("Since the shift to a sentencing scheme that strictly ties sentencing to the quantities of drugs involved, many courts and commentators have expressed concern over the large discretion that law enforce-

ment officials have in setting the amount of drugs 'involved' in a case."), *aff'd,* No. 98–1724L, 2001 WL 219285 (2d Cir. Mar.6, 2001) (unpublished). Accordingly, sentencing courts have a duty to carefully examine the record for signs of this abuse. *See United States v. Stavig,* 80 F.3d 1241, 1247 (8th Cir.1996) (reverse sting cases require "the most careful scrutiny and a probing examination by the district court").

In setting the drug quantity, the Sentencing Guidelines state that

in a reverse sting, the *agreed-upon* quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not by the defendant. If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

U.S.S.G. § 2D1.1, Application Note 12 (1997) (emphasis added). Where the agreed-upon quantity is contested, the Government has the burden to establish by a preponderance of the evidence the amount of drugs attributable to the defendant. *See United States v. Hendrickson,* 26 F.3d 321, 332 (2d Cir.1994). In determining the amount of drugs involved, district courts have broad discretion to consider all relevant information. *See United States v. Pico,* 2 F.3d 472, 475 (2d Cir. 1993). Moreover, "[a] sentencing court's calculation of quantity in a drug conspiracy will be upheld unless clearly erroneous."

*United States v. Jones,* 30 F.3d 276, 286 (2d Cir.1994).

Thus, in reverse sting cases, a sentencing court's focus must be on the agreement between the parties. As stated by Judge Eugene Nickerson:

> Where there is such a transaction the court can generally infer the quantity term by examining the agreement itself. The parties in the course of their dealings will presumably work out the details and reach an agreement on key terms such as the type of drugs, *price, financing, time and mode of delivery,* and, of course, the quantity.

> But even in cases involving drug transactions, the Second Circuit has cautioned against the hasty application of figures thrown out during negotiations to determine the amount of drugs attributable to the conspiracy.

*Cambrelen,* 29 F.Supp.2d at 124 (emphasis added). *See also United States v. Alaga,* 995 F.2d 380, 383 (2d Cir.1993) ("Where the defendant is a buyer, however, and negotiates for a particular quantity, he or she fully intends to commit the crime as planned.").[3]

▮ Here, while the parties may have discussed 70 kilograms, they only agreed to 35. This is most evident from the fact that financing was never discussed for the second 35 kilogram installment. Financing was a key issue with regard to the first 35 kilograms. Originally, Ezequiel Inoa was willing to take all 70 kilograms on consignment, but this proposal was rejected by Agent Fonseca. Eventually, Panduro got in touch with Reynaldo who was able to front $300,000. Agent Fonseca then agreed to deliver 35 kilograms. There are no transcripts of conversations discussing the financing terms with regard to the second 35 kilograms. This is because there was never an agreement to purchase the second 35 kilograms. Although Agent Fonseca repeatedly referred to "70 kilograms," mere repetition is not tantamount to an agreement. Because certain key terms, such as financing and time of delivery, were never agreed to by the parties, Panduro is only responsible for 35 kilograms.[4]

Finally, in the case of co-defendant Alberto Bare, the parties stipulated to an offense level based on 35 kilograms of cocaine. While this stipulation is not binding on the Government for all defendants, it highlights the arbitrary nature of setting the offense level based on the negotiated quantity of the sale. For example, the

---

**3.** While Application Note 12 uses the term "agreed-upon," thereby obviating the need for a definition of "negotiation," that term has been defined in the context of Application Note 1 to former U.S.S.G. § 2D1.4 (which directed courts to use "the weight under negotiation" in calculating the base offense level). *See Hendrickson,* 26 F.3d at 334. The Second Circuit held that "as used in Application Note 1, 'negotiation' must describe dealings closer to the agreement end of the spectrum, since the conspiracy's 'object' can only be the amount of narcotics the conspirators *agreed* to produce, not that which was merely discussed." *Id.* (emphasis in original). Accordingly, the terms "agreed-upon" and "negotiated" can be used interchangeably for purposes of Application Note 12 as well.

**4.** The reason that Panduro is not accountable for the second 35 kilograms is not because his co-conspirators lacked the financial resources for this additional purchase. When a defendant is convicted of conspiring to purchase drugs, the sentencing court need not consider the defendant's financial capacity to purchase the controlled substance. *See Gomez,* 103 F.3d at 253 (holding that the last sentence of Application Note 12 applies only where a defendant is selling drugs). However, because the parties never agreed on financing, not because defendants needed financing, no agreement was ever reached to purchase an additional 35 kilograms.

Second Circuit expressed some concern about the manipulation of drug quantity in *United States v. Caban*, 173 F.3d 89 (2d Cir.1999). In that case, the Government placed 5 kilograms of real cocaine and 45 kilograms of sham cocaine in a warehouse to be robbed by the defendant. *See id.* at 90. The sentence was set based on an offense level reflecting 50 kilograms of co-caine. *See id.* In affirming the defendant's sentence, the Second Circuit stated:

It is unsettling that in this type of reverse sting, the government has a greater than usual ability to influence a defendant's ultimate Guidelines level and sentence. It appears to be no coincidence that the [government] chose to place no less than 50 kilograms of real and sham cocaine in the warehouse; ... But we have no ability to force a downward departure as a matter of law. Moreover, *the district court undertook to offset any potential for prosecutorial overreaching by departing an additional two levels for acceptance of responsibility,* expressly noting that the weight of the drugs made the Guidelines level too severe for the usual two-level departure to correct.

173 F.3d at 93 (emphasis added).

There appears to be no principled reason here to hold Bare responsible for 35 kilograms, but to hold Panduro responsible for 70 kilograms, except for the vagaries of the plea bargaining process. *See United States v. Correa–Vargas,* 860 F.2d 35, 39 (2d Cir.1988) ("It must be remembered that plea bargaining, which the prosecutor largely controls, can bring about a huge difference in the sentences imposed for approximately the same conduct."). The Government has not sufficiently distin-guished Panduro's culpability from that of Bare to justify such a sentencing disparity. In fact, both defendants are described in the PSRs and the Government's submission in much the same way. *Compare* Bare PSR ¶¶ 9–24 (describing offense conduct) *with* Panduro PSR ¶¶ 9–24 (describing offense conduct in identical terms). *See also* Government's April 26, 2001 Letter at 10 ("And it was Panduro who, along with Bare, traveled to Seattle to serve as collateral for the transaction."). Panduro, who did not enter into a plea agreement, would be facing a sentence of 108–135 months if 70 kilograms were found to be the agreed-upon amount of drugs, while Bare was sentenced to 70 months. Such disparities are contrary to the spirit of the Guidelines which provide:

Policy statements governing the acceptance of plea agreements under Rule 11(e)(1), Fed.R.Crim.P., are intended to ensure that plea negotiation practices:

(1) promote the statutory purposes of sentencing prescribed in 18 U.S.C. § 3553(a);[5] and

(2) *do no perpetuate unwarranted sentencing disparity.*

U.S.S.G. Ch. 6, Part B, Introductory Commentary (emphasis added).

Although Bare has already been sentenced, his plea agreement is nonetheless relevant to this proceeding. If the Government impermissibly altered the amount of drugs with which Bare was involved in order to artificially deflate his Guidelines range, his plea agreement should not have been accepted by this Court. *See United States v. Stanley,* 928 F.2d 575, 582 (2d Cir.1991) (there is a Congressional expectation that judges will "examine plea

---

**5.** These purposes include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public, and to provide the defendant with needed correctional treatment. *See* 18 U.S.C. § 3553(a)(2).

agreements to make certain that prosecutors have not used plea bargaining to undermine the sentencing guidelines") (internal quotation marks and citation omitted). Assuming the Government acted in good faith, Bare's plea agreement is presumed to have been based upon a reasonable interpretation of the relevant facts. As there has been no change in the facts since Bare's sentencing, the Government is estopped from seeking a higher drug quantity for a similarly situated co-defendant. *See Correa–Vargas,* 860 F.2d at 40 (in some circumstances, judges can "ameliorate to some extent the skewing occasioned by plea bargaining"). I therefore conclude that 35 kilograms is the appropriate and agreed-upon quantity. *See id.* ("Only by allowing the district courts sensible flexibility can we promote the equally important purposes of just punishment, respect for the law and adequate deterrence set forth in the Sentencing Reform Act.").

### B. Application Note 15

■■ The Sentencing Commission recognizes that defendants are sometimes induced to purchase more drugs than they otherwise would have through discount pricing. Accordingly, a downward departure may be appropriate in such cases. *See Caban,* 173 F.3d at 93 (the Sentencing Guidelines address "the situation in which the government stretches the defendant's limited resources—and increases the quantity involved in the drug transaction—by discount pricing"). The Sentencing Guidelines provide as follows:

> If, in a reverse sting . . . , the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby lead-

ing to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price by the government agent, a downward departure may be warranted.

U.S.S.G. § 2D1.1., Application Note 15.[6] The natural corollary to Application Note 15 is that the same rationale should apply where the inflated quantity is set by offering overly generous credit terms, rather than discount pricing.

Two district courts have already reached this conclusion. In *Cambrelen,* the defendants had agreed to rob a warehouse they believed held 80 kilograms of cocaine, based on the word of a confidential informant who organized the robbery. *See* 29 F.Supp.2d at 124. The court found that the informant was, in effect, selling the cocaine on consignment to the defendants. *See id.* at 125. The defendants were to keep three-quarters of the proceeds of the sale of the stolen cocaine while the informant was to receive a quarter. *See id.* The court downwardly departed based on Application Note 15, stating:

> In the usual reverse sting case, an informant "artificially" enhances the number of kilos in the transaction by setting a price substantially below market price to induce the defendants to buy more kilos than his available resources would have allowed him. That is exactly comparable to what the informant did here. His proposal was in effect to furnish to defendants on consignment whatever cocaine was in the warehouse—he claimed 80 kilos—in exchange for payment of one-quarter of the amount thereafter obtained on the sale of the cocaine. The "price" to the defendants for their share

---

**6.** Application Note 15 departures are encouraged departures. *See Lora,* 129 F.Supp.2d at 90.

was low indeed, far below the market rate. The informant thus tried to ratchet up the number of years of incarceration the defendants would face.

*Id. See also Lora,* 129 F.Supp.2d at 92 ("The relevant question, then, is not simply whether the price per kilogram was artificially low, but whether the government's financial terms in general were artificially generous, or otherwise unrepresentative of market practices.").

Thus, below market pricing can be achieved in at least two ways: through discount pricing or by overly generous credit terms.[7] Application Note 15 should apply to both situations. The next step is to determine whether Panduro has satisfied the requirements for a downward departure. Application Note 15 has been described as involving a two-part test. *See Lora,* 129 F.Supp.2d at 90. The first prong asks whether the Government offered a below market price through discount pricing or overly generous credit terms. *See id.* at 91. The second prong asks whether such discount pricing or overly generous credit terms induced the defendants to purchase more cocaine than their available resources would have allowed. *See id.*

■ Here, the second question is easily answered in the affirmative. If Agent Fonseca had not extended credit for half of the purchase price for the 35 kilograms, defendants would have been limited to 19 kilograms. It was only through Agent Fonseca's extension of credit that defendants were able to purchase the entire 35 kilograms. The only remaining question, then, is whether it was reasonable for Agent Fonseca to "front" half of the co-

caine. This is a fact intensive inquiry. *See id.* at 81.

I recognize that drugs are often sold on consignment or on credit with a down payment. *See Gomez,* 103 F.3d at 253; *Lora,* 129 F.Supp.2d at 95 ("So long as the [defendants] convinced a drug wholesaler of their trustworthiness and ability to pay later, the typical wholesaler would not demand a large down payment."). However, when such sales are made, there is generally some assurance that payment will be made. Such indicia include a pre-existing business relationship or a detailed understanding of the purchaser's drug distribution network. Here, there are neither. All of the defendants were strangers to Agent Fonseca. Moreover, Agent Fonseca knew virtually nothing of the purchaser's drug distribution network or their capacity to move multi-kilos of cocaine. Finally, the changing cast of characters would have made any real world wholesaler wary. Under these circumstances, an extension of credit for 50% percent of the purchase price is both unreasonable and below market. Accordingly, to adjust for the artificially low price of the cocaine resulting from the overly generous credit terms, a downward departure of three levels is appropriate.

**C. Minor Role Adjustment**

■ Application Note 3 to U.S.S.G. § 3B1.2 defines a minor participant as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." This would entail comparing the relative culpability of the defendant being sentenced to that of his co-defendants. There is, however, a judicial gloss that requires comparison with the conduct of an average partici-

---

7. The quoted price per kilogram of $16,000, while on the low side of the DEA's list of drug prices for the Seattle area, is within the range of prices used in undercover buys. *See* Government Exhibit 1 (Seattle Field Division—2nd Quarter FY 00). Discount pricing is therefore not an issue.

pant in the type of crime at issue. As explained by the Second Circuit,

> [t]his Court has made clear that "the Sentencing Commission intends for culpability to be gauged relative to the elements of the offense of conviction, not simply relative to co-perpetrators." *United States v. Pena,* 33 F.3d 2, 3 (2d Cir.1994); *see also United States v. Lopez,* 937 F.2d 716, 728 (2d Cir.1991) (reduction appropriate where defendant is "substantially less culpable than the *average* participant") (quoting U.S.S.G. § 3B1.2, comment. (backg'd) (emphasis in *Lopez))*; *United States v. Caruth,* 930 F.2d 811, 815 (10th Cir.1991) ("the Guidelines permit courts not only to compare a defendant's conduct with that of others in the same enterprise, but also with conduct of an average participant in that type of crime").

*United States v. Ajmal,* 67 F.3d 12, 18 (2d Cir.1995).

Following this mandate, Panduro would have to be less culpable than his co-defendants, Bare and Inoa, and would also have to be less culpable than the average broker or intermediary of a large drug transaction. He is neither. As an intermediary between Agent Fonseca and the purchasers, Panduro made numerous telephone calls to Agent Fonseca, found various purchasers, flew out to Seattle to meet with Agent Fonseca, negotiated the terms of the transaction, and ultimately served as human collateral for the deal. One would be hard pressed to find something that Panduro did not do to facilitate the deal. Accordingly, Panduro is not less culpable than either his co-defendants or an average drug intermediary and is not entitled to a minor role adjustment.

### D. Extraordinary Family Circumstances

 While Talia's situation is tragic, it does not warrant a family circumstances departure for Panduro. A family circumstances departure is only appropriate where it is clearly established that the defendant is a unique source of financial and/or emotional support for his family. *See, e.g., United States v. Galante,* 111 F.3d 1029, 1037 (2d Cir.1997); *United States v. Johnson,* 964 F.2d 124, 129 (2d Cir.1992); *United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991). While Panduro does provide some emotional support to his daughter via telephone calls, he is not the child's only source of such support. Panduro's mother, who is currently caring for the child, provides the majority of Talia's emotional support. As for financial support, Panduro testified that he has not sent his family money since he became unemployed in November of 1999. Thus, Panduro cannot be considered the sole source of emotional and/or financial support for his daughter. Panduro's motion for a downward departure based on extraordinary family circumstances is therefore denied.

### III. CONCLUSION

Panduro's offense level is calculated as follows. His base offense level is 34 based on 35 kilograms of cocaine. Two levels are subtracted as the defendant qualifies for the Safety Valve provisions of 18 U.S.C. § 3553(f). *See* U.S.S.G. § 2D1.1(b)(6). Three additional levels are subtracted for Panduro's acceptance of. responsibility. *See* U.S.S.G. § 3E1.1(a) and (b). Finally, a downward departure of three levels is granted pursuant to Application Note 15. At offense level 26, Criminal History Category I, Panduro's Guidelines range is 63 to 78 months in custody. Sentencing is set for June 1, 2001 at 12:00 p.m.