**UNITED STATES of America,**
**Appellee,**

v.

**Darrel A. GOODWIN, Appellant.**

**No. 01–3070.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 1, 2002.

Decided Jan. 31, 2003.

Beverly G. Dyer, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was A.J. Kramer, Federal Public Defender.

Thomas S. Rees, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Roscoe C. Howard,

Jr., U.S. Attorney, and John R. Fisher, Mary-Patrice Brown, and Kenneth F. Whitted, Assistant U.S. Attorneys.

Before: RANDOLPH and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

In early 1999 Darrel Goodwin was arrested by agents from the Drug Enforcement Administration ("DEA") who had just sold him cocaine. Although testimony suggested that at the time the market price for a single kilogram of cocaine was above $27,000, Goodwin had made a deal to buy three kilograms at a unit price of $20,000 each. On the day of his arrest, Goodwin paid about $20,000 in cash and $1,500 worth of heroin toward the purchase of the first two kilograms, with the balance to be paid on the second kilogram once he had sold the drugs. In addition, Goodwin agreed to come back the following day to pay for and collect the third kilogram.

Goodwin argues that his case squarely fits the language of Application Note 14[1] to § 2D1.1 of the United States Sentencing Guidelines ("U.S.S.G."), which under some circumstances allows (but doesn't require) a departure in a "reverse sting" (a drug sale by government agents to the defendant). Specifically, the Note authorizes departure where the agent "set a price ... that was substantially below the market value ...," leading the defendant to purchase a "significantly greater quantity" than he otherwise could have. At sentencing the district court rejected the argument as unsupported by the evidence. We cannot say that the district court erred in

denying the departure, and accordingly affirm.

\* \* \*

In January 1999 DEA agents began working with a confidential informant who introduced them to Goodwin. On three occasions Goodwin sold the informant and DEA Special Agent Kenneth Abrams small amounts of heroin (totaling 56.8 grams), "fronting" Abrams and the informant on two occasions. During one of these transactions, Goodwin sold $3,500 worth of heroin for only $2,450, with the remainder to be paid later, and another time he sold $2,620 worth, requiring only $1,500 up front.

At some point during these transactions Abrams and Goodwin began discussing the possibility of working together to buy cocaine. At first, they discussed a transaction in which they would split one kilo, toward which Goodwin would contribute $10,000. Abrams told Goodwin he had a source that could sell cocaine for about $24,000 per kilogram and that the source could supply larger volumes as well. Goodwin said that he—along with an unnamed partner—could come up with $37,000 toward a deal.

In early February Abrams brought Goodwin to meet Special Agent Robert Valentine, who was posing as the source of the cocaine. Valentine explained that he could sell Abrams and Goodwin five kilos for $100,000. In Goodwin's presence, Agent Abrams gave Valentine $10,000 as a fake down payment; the record is obscure on the role of this payment, and Goodwin makes no claim that it was a part of the payment made for his drugs in the offense of conviction. Goodwin told the agents

1. As renumbered effective November 1, 2002 from the former but identically worded Application Note 15.

that he could come up with about $15,000 and "his people" could come up with about $24,000.

A few days later, Goodwin met with Agents Abrams and Valentine at a hotel. Goodwin said that he only had about $20,000 but that he was still interested in buying the cocaine. Valentine asked Goodwin if he had any heroin to trade for cocaine. Goodwin produced 14 grams of heroin, worth about $1,500.

After sampling the cocaine and approving its quality, Goodwin agreed to purchase three kilos for $20,000 each. He paid $19,870 for the first kilogram, and gave the $1,500 worth of heroin as a down payment on the second, with further payment to come from street sales of the purchased cocaine. Goodwin was to return for the third kilogram the following day. But as he left the room with the first two kilos, officers arrested him.

Goodwin pled guilty to possession of 500 grams or more of cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii). At Goodwin's sentencing hearing, Agent Abrams testified that the price of cocaine at that time was $26,000 or $27,000 per kilo in New York or Miami, and that prices in Washington, D.C. were higher than in New York or Miami. Abrams testified that the $20,000 per kilo price agreed to by Goodwin reflected a negotiated bulk discount. Goodwin argued that the court should use its discretion to grant a downward departure because the agents had induced his purchase with a price that was "substantially below the market value." U.S.S.G. § 2D1.1, Application Note 14.

Although the terms in which the district court judge disposed of Goodwin's Application Note 14 theory are not crystal clear, a fair reading is that he rejected both the claim that the sale was on terms substantially below market and the claim that any below-market pricing induced a purchase

of higher volume—both of which are necessary for a Note 14 departure. On the first element, for example, he said that he could not "find that either the second or third kilograms should be unattributable to Mr. Goodwin," emphasizing the "substantial down payment" and noting that Goodwin "was expected, obviously, to pay the rest. He wasn't given these drugs for free." The latter phrase ("for free") strikes us as simply a hyperbolic way of expressing the idea that Goodwin had not shown the terms to be markedly more favorable than could be expected in the market. In addition, the district court found that the deal "was not induced by" the price.

For sentencing purposes the district court assigned Goodwin a base offense level of 28, which covers the range from 2 to 3.5 kilograms of cocaine (or its equivalent under the Guidelines' drug equivalency table). U.S.S.G. § 2D1.1(c) & Application Note 10. It attributed the entire three kilograms of cocaine to Goodwin, and may also have included the 70.8 grams of heroin he sold the agents. But as the 70.8 grams of heroin converts to only .354 kilos of cocaine, it did not affect the offense level even if included.

Goodwin presents two arguments for reversal. First, he argues that the court erred because the price for the first kilogram of cocaine—about $20,000 rather than upwards of $27,000—was artificially low and triggered the court's power to depart. Second, he says that the credit terms for the second kilogram were overly generous, because the agents didn't have enough knowledge of Goodwin's ability to profitably distribute large amounts of cocaine, not to mention his reliability; the credit terms were thus the equivalent of lower prices, and therefore permit departure.

Finding no clear error in the finding that Goodwin failed to show that the terms were substantially more favorable than in the market generally, we affirm.

\* \* \*

■ Congress has devised a "trichotomy" for review of district court resolution of Guidelines issues: "[P]urely legal questions are reviewed *de novo*; factual findings are to be affirmed unless 'clearly erroneous'; and we are to give 'due deference' to the district court's application of the guidelines to facts." *United States v. Kim,* 23 F.3d 513, 517 (D.C.Cir.1994) (citing 18 U.S.C. § 3742(e)); see also *Buford v. United States,* 532 U.S. 59, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001); *United States v. Sammoury,* 74 F.3d 1341, 1343–44 (D.C.Cir.1996). There is some ambiguity whether the district court's decision not to apply Note 14 involved a finding of fact (and thus should be reviewed under the "clearly erroneous" standard) or an "application of the guidelines to the facts" (and thus should be reviewed under the intermediate "due deference" standard). Certainly the line between the two can be unclear. Compare, e.g., *United States v. Brooke,* 308 F.3d 17, 20–21 & n. 4 (D.C.Cir.2002) (using clear error standard to review whether home confinement would be "equally efficient as" incarceration), with *Kim,* 23 F.3d at 517 (using due deference standard to review whether defendant's actions constituted "more than minimal planning"). Here, however, both parties assume that the standard is one of clear error. We accordingly apply that standard, though noting that we would reach the same outcome if we used "due deference." The defendant bears the burden of proving by a preponderance of the evidence that he is eligible for a downward departure. See, e.g., *United States v. Sachdev,* 279 F.3d 25, 28 (1st Cir.2002).

■ Application Note 14 states:

If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

U.S.S.G. § 2D1.1, Application Note 14. The sentencing court's discretion to grant a departure therefore requires a price that both is "substantially below the market value" and induces the defendant to purchase a "significantly greater quantity" than he otherwise could. See *id.*

We pause to observe three ambiguities in the Note. First, it appears to see a low price as an inducement only in the sense that it might enable a potential buyer to stretch his resources farther, i.e., it would increase the quantity that a buyer is *able* to buy. Thus it seems to overlook the conventional notion of price elasticity—the effect on the quantity that a buyer, even one with ample resources, would be *willing* to buy. After all, a person who is willing to buy only ten units of a good at a unit price of $100, even though he has the resources to buy many more, might well up his purchase if the goods were offered at a unit price of $50. The Guidelines seem to offer no protection to the buyer whose willingness to buy is drastically affected by a discount, so long as the drugs would have been within his ability to pay even if offered at market rates.

■ Second, the Note's focus on how much a buyer's "available resources" would allow him to purchase could be read

to skew the role of credit. Credit transactions allow a buyer to purchase more drugs than if he were required to pay cash up front; if one read "available resources" to encompass only assets available for immediate transfer, a broad array of transactions at market terms would qualify for the departure. We do not read the term "available resources" so narrowly. Rather, we assume that access to credit on terms prevailing in the market, is, like cash, one of a buyer's "available resources." Thus a defendant cannot simply assert that any quantity purchased on credit should be counted as more than his "available resources" would allow.

■ Third, the Note says nothing explicit on how a court is to determine whether a purchase increment induced by discount pricing is "significant[ ]." While we would not hazard a complete definition of "significant" in this context, it must at least foreclose the use of Note 14 where the increase due to favorable terms had no effect on sentencing at all—a matter that turns largely on the Guidelines' "brackets" for drug quantities. (A judge whose sentencing *within* a bracket is influenced by intra-bracket variations of course needs no special authorization to make adjustments for any effect of discounts.) Here the most relevant divide is at two kilograms of cocaine (or its equivalent). At or above two kilos (all the way up to 3.5), Goodwin would be at Level 28, which the district court used. Below two kilos (even by a hair, all the way down to 500 grams), he would be at Level 26. See U.S.S.G. § 2D1.1(c). Thus it makes no difference whether he purchased two kilograms or three; relief would be proper only if the alleged discount played a role in luring him up to two (or its equivalent).

The district court reviewed the evidence and determined that Goodwin had received a discounted bulk-rate price of $20,000 per kilogram. Abrams had testified that the price reflected a quantity discount. While Goodwin's counsel questioned Abrams about the price of individual kilograms, he did not elicit any testimony from him (or offer any other evidence) to suggest that $20,000 per kilo was not within the normal market range for a two-or three-kilo delivery. A brief review of appellate decisions in narcotics cases suggests that volume discounts are indeed available in the drug world, much as in lawful markets. See, e.g., *United States v. Thomas*, 284 F.3d 746, 754 (7th Cir.2002); *United States v. Pressler*, 256 F.3d 144, 151 (3d Cir.2001); *United States v. Wilson*, 244 F.3d 1208, 1211 (10th Cir.2001). While the government did not offer affirmative evidence that the bulk discount here—roughly 25% off the per-kilo price for a single kilo—conformed to market realities for a two-or three-kilogram deal, it was Goodwin who bore the burden of showing that Note 14 applied. See *Sachdev*, 279 F.3d at 28.

■ Nor can we say that the credit terms—allowing Goodwin to walk away with $40,000 worth of cocaine while paying only $19,870 in cash and $1,500 in heroin—change this analysis. We agree with Goodwin that overly generous credit terms can be the equivalent of a reduction in a cash price for purposes of Note 14. But we see no clear error here. "Fronting," i.e., a sale on credit with the balance expected to be repaid from street sale revenues, appears, like volume discounts, to be a common practice in the drug market. See, e.g., *United States v. Ramsey*, 165 F.3d 980, 982 (D.C.Cir.1999); *United States v. Tarantino*, 846 F.2d 1384, 1395 (D.C.Cir.1988). Indeed, Goodwin himself fronted drugs to Agent Abrams on at least two occasions, despite knowing little about him.

■ Thus the question is only whether the relationship between Goodwin and the agents here was such that credit on this

scale would not have been available to Goodwin in the actual drug market. He asserts it would not:

> The agents had no knowledge of Goodwin's circumstances, contacts, drug distribution network, or his experience dealing cocaine, and they did not require Goodwin to confirm when he would be able to repay them the remaining $18,500. No experienced drug seller would have fronted a first-time buyer a kilogram of cocaine in exchange for such a small amount of heroin without such knowledge. Most large scale drug sellers would require cash, not heroin, in payment. The agents were also likely aware of Goodwin's heroin addiction, and no experienced seller of drugs would have engaged in this transaction with a heroin addict. For these reasons, the agents extended credit terms for the second kilogram that never would have been available in an actual drug market.

Appellant's Br. at 13.

Perhaps this is true. But the paragraph notably fails to cite any supporting evidence for its view of market behavior. Moreover, the only case cited by Goodwin as manifesting such a view of the drug market, *United States v. Panduro*, 152 F.Supp.2d 398, 407 (S.D.N.Y.2001), involved a dealer fronting more than 15 times the amount of cocaine fronted in this case, and noted that the question of overly generous credit terms was a "fact intensive inquiry." *Id.* at 407.

Furthermore, counsel rather clouds the facts with his depiction of the agents' virtually throwing drugs at an unknown purchaser. First, while the agents had had no cocaine dealings with Goodwin, they had had two successful frontings of heroin (although, to be sure, on a smaller scale and with Goodwin the one who extended credit). And while Goodwin says that the agents were aware of his heroin addiction (and suggests that seasoned sellers would not deal with such an addict), he promised them he would turn up with tens of thousands in cash and he came through with nearly $20,000. This is hardly behavior consonant with Goodwin's self-depiction as a person unfitted by addiction for serious drug dealing. In addition, he certainly presented himself as an experienced cocaine dealer, telling the informant that he was "continuing" to sell crack cocaine but was unhappy with the prices he was paying in light of the quantities he was purchasing. And before the delivery was final, he sampled the cocaine and commented on its quality, which was a sign of experience (real or feigned). Of course here we encounter a general difficulty with Application Note 14: if the terms offered are "substantially" below market levels, one might expect the buyer—unless a real neophyte—to smell a rat. But we do not rely on that problem. Here Goodwin has simply failed to offer adequate proof of a material deviation from market terms.

We thus find no clear error in the district court's conclusion that Goodwin failed to prove that the agents set a price (credit terms included) that was "substantially below the market value" of the drugs.

The judgment of the district court is

*Affirmed.*