UNITED STATES of America

v.

**Ambionis SORIANO and Heriberto Castro, Defendants.**

**No. 01 CR.534 JGK.**

United States District Court,
S.D. New York.

Dec. 10, 2003.

---

David J. Goldstein, Goldstein, Weinstein & Folk, Bronx, NY, Jonathan Marks, Jonathan Marks, P.C., Noah Lipman, Law Off. Noah Lipman, New York, NY, for Defendants.

Steven Glaser, United States Attorney, New York, NY, for Plaintiff.

## OPINION and ORDER

KOELTL, District Judge.

The defendants, Ambionis Soriano and Heriberto Castro, each pleaded guilty to

one count of conspiring, from April 12, 2001 through May 9, 2001, to distribute five kilograms and more of cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846.

The defendants moved for various downward departures discussed below. Because the requested downward departures involve disputed issues of fact, the Court held an evidentiary hearing on September 26, October 7, and October 14, 2003. The Court heard testimony from a confidential informant ("CI"), from Detective John Fallon, and from both defendants. The Government and the defendants submitted various exhibits to the Court. The parties also thereafter submitted post-hearing submissions. Having reviewed the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law with respect to the sentencing issues raised by the defendants.

## I.

██ Both defendants move for a three-level reduction in their respective base offense levels pursuant to § 2X1.1(b)(2) of the Sentencing Guidelines on the grounds that they abandoned the conspiracy and that the conspiracy was never completed.[1] However, § 2X1.1 provides that when a conspiracy "is expressly covered by another offense guideline section," the other section should be applied. U.S.S.G. § 2X1.1(c)(1). Application Note 1 to § 2X1.1 states that "[o]ffense guidelines that expressly cover conspiracies include ... § 2D1.1," the guideline that applies to the conspiracy to which the defendants

pleaded guilty. U.S.S.G. § 2X1.1, cmt. n.1. Therefore, the three-level adjustment provided in § 2X1.1 is not available to the defendants, because the plain text of the Guidelines requires the application of § 2D1.1 in determining their sentences. *See United States v. Onheiber,* 173 F.3d 1254, 1256–57 (10th Cir.1999) (holding that § 2X1.1 does not apply to attempts involving drugs); *United States v. Adipietro,* 983 F.2d 1468, 1472 (8th Cir.1993) (concluding that § 2X1.1 does not apply to conspiracies involving controlled substances). Section 2D1.1 does not provide a similar downward adjustment for uncompleted conspiracies.

## II.

██ Both defendants also move for a downward departure pursuant to Application Note 14 to § 2D1.1 of the Guidelines. Application Note 14 states:

If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

U.S.S.G. § 2D1.1, cmt n.14. Therefore, before invoking the discretion granted by Application Note 14, a sentencing court

---

1. Section 2X1.1(b)(2) provides that the base offense level for a conspiracy should be reduced by three levels "unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete

all such acts but for apprehension or interruption by some similar event beyond their control." The Presentence Investigation Reports prepared by the Probation Office use the November 2001 Guidelines Manual, but there is no difference for any of the calculations by using the current Guidelines Manual with changes effective as of April 30, 2003.

must first apply a two-part test that asks: (1) whether the terms of the deal resulted in a price "substantially below the market value of the controlled substance," and (2) whether those terms induced the defendant to purchase "a significantly greater quantity of the controlled substance" than his "available resources" would have otherwise permitted. *Id.; see also, United States v. Goodwin*, 317 F.3d 293, 297 (D.C.Cir.2003). As is generally the case when a defendant seeks a sentencing adjustment pursuant to the Guidelines, the defendant bears the burden of proof by a preponderance of the evidence. *See United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir.1997); *Goodwin*, 317 F.3d at 297.

■ In this case, the defendants have not carried their burden of proving that the terms of the deal proposed by the Government agent resulted in a price "substantially below the market value of the controlled substance." U.S.S.G. § 2D1.1, cmt. n.14. The defendants agreed to purchase 100 kilograms from the CI in Tampa, Florida, for delivery in New York, at $17,500 per kilogram, for a total of $1,750,000. (Transcript of Hearing dated Sept. 26, 2003 ("9/26/03 Tr.") at 25–26, 44, 67–68.) Detective Fallon testified that cocaine prices vary based upon the geographic location in which the drugs are purchased, and he specifically testified that prices are lower in Florida, Texas, and other ports of entry into the United States. (Transcript of Hearing dated Oct. 14, 2003 ("10/14/03 Tr.") at 15–16.) Based upon his review of DEA quarterly reports for prices of narcotics throughout the country, Detective Fallon testified that the price of multi-kilogram quantities of cocaine in Tampa, Florida in 2001 ranged between $12,000 and $17,000 per kilogram. (*Id.* at 16–17.) The CI similarly testified that the price of multi-kilogram quantities of cocaine in Tampa in 2001 was somewhere between $12,500 and $14,500. (9/26/03 Tr. at 107.) The relevant geographic market in this case is Tampa, Florida, because that is where the defendants agreed to purchase the drugs. Based on the record before the Court, it cannot be concluded that a proposed price of $17,500 per kilogram in a 100–kilogram transaction was substantially below the market value for cocaine in this geographic area and for a deal of this size.

The defendants' argument that the relevant benchmark for market value should be the higher market price in New York City, where the defendants intended to sell the cocaine and where the cocaine was to be delivered, is unavailing. The defendants note that the CI testified that the wholesale price in New York City for one kilogram of cocaine in a similarly-sized deal would be between $23,000 and $25,000. (9/26/03 Tr. at 26–27.) The defendants also point out that everyone involved in the deal understood that the defendants planned to sell the cocaine in New York. However, the evidence establishes that the defendants planned to purchase the cocaine in Florida in order to capitalize on the lower wholesale purchase prices in that region. They were willing to pay an additional $50,000 transportation fee to have the drugs delivered to New York, a fee that would have allowed them to get the drugs at the lower price in the Florida market and resell them at the higher price in the New York market.

The defendants' argument that they were induced to enter into the transaction because of the overly liberal credit terms extended by the CI is unpersuasive. The transaction in this case involved "fronting," a method commonly used to finance drug transactions, whereby drugs are purchased through a partial down payment along with an agreement that the balance will be repaid from profits earned as the drugs are resold at the retail level. *See Goodwin*, 317 F.3d at 298 (" 'Fronting,' i.e., a

sale on credit with the balance expected to be repaid from street sale revenues, appears, like volume discounts, to be a common practice in the drug market."); 9/26/03 Tr. at 29–31, 113–14. The initial agreement reached by the defendants and the CI in this case involved a $50,000 transportation fee plus a down payment of $200,000, although the down payment was later reduced to somewhere between $100,000 and $150,000. Even though the defendants had not dealt previously with the confidential informants in this case, the defendants understood that they were being fronted the cocaine because they had come to Florida to meet the CIs face-to-face, because the CIs knew where to locate them in the future, and because the CIs had received assurances of the defendants' reliability. As one of the CIs told the defendants in a recorded conversation: "Listen, buddy, if you hadn't come down here, I wouldn't have done business with you.... Now all five of us have met each other and the five of us know where we can find each other...." (Gov't Ex. 6–T (N–101A) at 54.) The defendants have not established that a down payment of over $100,000, together with a $50,000 transportation payment and a threat of retribution if the remainder of the payments were not made, resulted in a payment plan that was so generous that it placed the price of the cocaine substantially below its market value. There is no reason to believe that the credit terms offered to them were substantially better than those routinely offered in similar, real-world narcotics transactions. *See United States v. Lora,* 129 F.Supp.2d 77, 94–95 (D.Mass.2001) (concluding that a

$27,000 down payment on a 65–kilogram deal worth $1,137,500 was not artificially generous, because "[s]o long as the [defendants] convinced a drug wholesaler of their trustworthiness and ability to pay later, the typical wholesaler would not demand a large down payment").

Even if the price of the cocaine had been substantially below market value, and it is plain that it was not, the defendants have also failed to establish that they were induced by the terms of the transaction to purchase significantly more cocaine than their available resources would have otherwise permitted. Even before the final agreement on 100 kilograms was reached, the defendants professed their ability to move large amounts of cocaine.[2] On April 16, 2001, defendant Soriano had a conversation with the CI concerning the possibility that the deal would be for 250 kilograms, and the two of them discussed only the quality of the cocaine, not its price. (9/26/03 Tr. at 112–13; Transcript of Hearing dated Oct. 7, 2003 ("10/7/03 Tr.") at 40–41; Gov't Ex. 10–T at 2–4.) At the same time, Soriano represented to the CI that he could move 250 kilograms in about three weeks. (10/7/03 Tr. at 42–43.) Later, at a meeting in Florida, Soriano informed the CI that he could "[o]f course" move 150 kilograms of cocaine. (*Id.;* Gov't Ex. 6–T (N–101A) at 21.) Defendant Castro also represented to the CIs during his trip to the airport that he and Soriano moved 250 kilograms of cocaine every two weeks. (Gov't Ex. 2–T at 7.) Although the defendants now disclaim these representations as mere puffing, the statements re-

---

2. The defendants mistakenly rely on *United States v. Panduro,* 152 F.Supp.2d 398, 404 (S.D.N.Y.2001), for the proposition that discussions preceding an actual agreement on price and terms cannot be evidence of a defendant's predisposition to enter into an agreement to purchase a certain quantity of drugs. In *Panduro,* the court held that dis-

cussions before a meeting of the minds could not be evidence of the quantity of drugs actually agreed upon, not that such discussions could not be probative of a defendant's predisposition to enter into a transaction of a certain size. Here, there is no dispute that the parties agreed upon a deal for 100 kilograms of cocaine.

322

veal the defendants' contemporaneous belief that they could move large quantities of cocaine quickly in New York-which they believed to be "dry"-in order to repay any balance due on the cocaine that was fronted to them. Therefore, a 100–kilogram transaction was one that the defendants could have and would have conducted with their available resources, regardless of the $17,500–per–kilogram price offered to them.

Therefore, the credible evidence establishes that the defendants agreed to purchase 100 kilograms of cocaine because they thought the cocaine was of sufficiently good quality that they could quickly resell the cocaine in New York-where the cocaine supply, according to them, was "dry"-not because of the price at which they could buy the cocaine. The evidence also establishes that the price offered to the defendants was not substantially below the market value of cocaine in deals of similar size in Tampa, Florida. The defendants' request for a downward departure pursuant to Application Note 14 to § 2D1.1 is denied.

### III.

■ Defendant Castro also moves for safety-valve relief. Pursuant to 18 U.S.C. § 3553(f) and § 5C1.2 of the Guidelines, the Court must sentence defendant Castro without regard to the mandatory minimum, and the defendant would be entitled to a two-level downward adjustment pursuant to § 2D1.1(b)(6) of the Guidelines, if the Court finds that the defendant meets all five of the criteria set forth in 18 U.S.C. § 3553(f)(1)-(5). The parties dispute whether the defendant has satisfied the fifth criterion, which requires that:

not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were

part of the same course of conduct or of a common scheme or plan...

18 U.S.C. § 3553(f)(5). The Government contends that defendant Castro has not satisfied this requirement for two reasons: (1) because he has denied any past involvement with narcotics transactions before the conspiracy charged in this case, and (2) because he claimed that the CI stole $5,000 of the $50,000 payment that defendant Soriano asked him to deliver to the CIs in Florida. Defendant Castro maintains that he has been entirely forthcoming and truthful in his safety-valve proffer sessions with the Government.

■ A defendant seeking safety-valve relief bears the burden of proving by a preponderance of the evidence that he meets all five of the relevant criteria. *United States v. Ortiz,* 136 F.3d 882, 883 (2d Cir.1997) (per curiam); *Gambino,* 106 F.3d at 1110. Having reviewed the testimony, the exhibits, and the submissions of the parties, and having assessed the credibility of the witnesses, the Court concludes that defendant Castro has not met his burden in proving that he truthfully disclosed all information and evidence that he has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan.

First, defendant Castro's conversations with the CIs in this case-conversations which, unknown to Castro, were being recorded-indicate his prior involvement with similar drug transactions. Defendant Castro now attempts to disavow the statements he made in these conversations as "puffing." However, his current self-serving denials do not diminish the fact that the statements themselves are powerful evidence of the truth of the statements. In at least three instances, Castro indicated that either New York or Miami was "dry," meaning that the cities had a low supply of cocaine-knowledge that would

have been unavailable to someone inexperienced with the drug trade, and that would have been easily refuted if asserted cavalierly. (Gov't Ex. 1–T at 3–4, 7; Gov't Ex. 2–T at 2.) Castro also told the CI that, while he and Soriano had in the past used brokers in the course of drug transactions, and that they were "doing well," they hoped "to do something direct so we don't have to use any brokers." (Gov't Ex. 7–T at 8.) In the conversations, Castro also provided testimonials to his and Soriano's drug-dealing experience and acumen. On one occasion he told the CIs: "[W]e've been working for a long time and ... and we keep our word, you understand? That's why people always want to work with us and ... and they trust us...." (Gov't Ex. 1–T at 10.) At another time, Castro stated to the CIs: "... [W]e want you to see how we deal with you, you know, no matter who it is we're always the same, it's always positive and professional you see? Professional in all respects because we've never let anyone down." (Gov't Ex. 2–T at 3.) After viewing and testing the cocaine at the airport, Castro also reported to Soriano by phone that the CIs, with whom Castro and Soriano planned to conduct the transaction, were "very well organized." (Gov't Ex. 1–T at 32.) Castro's claim that all of these statements, as well as those indicating his ability to move large quantities of cocaine, were mere "puffing" is not credible.

Moreover, the evidence of defendant Castro's involvement in the transaction in this case substantiates the conclusion that he had participated in other drug transactions. For example, Soriano entrusted Castro with $50,000 in cash to carry to Florida in order to cover the cost of transporting the cocaine to New York. Moreover, the evidence credibly establishes that Soriano sent Castro to Florida not only to deliver the $50,000, but also to test the cocaine. Although Castro denies ever having tested the drugs, the CI's testimony,

supported by the recorded conversations, persuasively establishes that Castro did in fact test the drugs on the airplane. The CI credibly testified that Castro tested the cocaine by rubbing some on his teeth, a method commonly used to authenticate cocaine based on how quickly its numbs one's mouth. (9/26/03 Tr. at 81, 115.) After testing the drugs, Castro spoke with Soriano by phone and confirmed the authenticity and the quality of the cocaine. Castro informed Soriano that the cocaine "was very good, I'm telling you, the ones which take off fast, the one that really goes fast," meaning that the cocaine would be very easy to resell. (Gov't Ex. 1–T at 31–32; 9/26/03 Tr. at 115.) Castro's testimony about his inspection of the drugs was not credible. He testified that he had no experience with drugs and did not know how to test them and did not test them. (10/14/03 Tr. at 33–34.) He testified that when he said that the drugs were "very good ... the ones which take off fast, the one that really goes fast," all he meant was "it looked like a package of drugs...." (*Id.* at 34.)

Defendant Castro's conduct in this case, which included being entrusted with $50,000 in cash to make a partial payment in an illegal narcotics transaction as well as being called upon to authenticate the cocaine supplied by the CIs, is convincing supporting evidence for Castro's own statements that he and Soriano had collaborated on prior drug deals and that Castro was experienced with drug transactions. The testimony by Soriano and Castro that Castro had not been involved in prior drug transactions is simply not credible. (*See* 10/7/03 Tr. at 29, 61–62; 10/14/03 Tr. at 20.)

Because defendant Castro's untruthful denial of any prior involvement in narcotics activity is sufficient to deny him safety-valve relief, it is unnecessary for the Court

to determine whether Castro was also untruthful in claiming that the CI stole the missing $5000. Defendant Castro's request that the Court apply the safety-valve provision of the Guidelines is therefore denied.

## CONCLUSION

For the reasons explained above, the defendants' requests for downward departures are denied.

**SO ORDERED.**